709 S.E.2d 549

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Christopher PROCTOR, Defendant Below, Appellant.**

No. 35647.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 9, 2011.

Decided April 1, 2011.

George Castelle, Esq., Justin M. Collin, Esq., Kanawha County Public Defender Office, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Robert D. Goldberg, Esq., Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

This case is before the Court upon an appeal by the appellant, Christopher Proctor, of the November 23, 2009, order of the Circuit Court of Kanawha County which denied his motion for a reconsideration of his sentence. Following a guilty plea, the circuit court sentenced the appellant to five-to-twenty-five years in the state penitentiary on one count of first degree sexual abuse under W.Va.Code § 61–8B–7 (2006),[1] and ten-to-twenty years on one count of sexual abuse by

---

1. West Virginia Code § 61–8B–7, in part, provides:

(a) A person is guilty of sexual abuse in the first degree when:

. . . .

(3) Such person, being fourteen years old or more, subjects another person to sexual contact who is younger than twelve years old.

a parent, guardian or custodian as per W.Va. Code § 61–8D–5 (2005).[2] The sentences were ordered to be served consecutively. In this appeal, the appellant seeks reversal of the circuit court's order and remand of the case to the circuit court for reconsideration of his sentence. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court is of the opinion that the circuit court did not commit reversible error and accordingly, affirms the decision below.

## I.

## FACTS

At the time of the incident, the appellant, Christopher Proctor, was living in Rand, West Virginia, with his fiancee, C.J.,[3] C.J.'s three-year-old daughter, J.J., and their eight-month-old daughter, C.P.[4] On the evening of February 7, 2008, the appellant entered J.J.'s bedroom, pulled her pants down, and rubbed her vagina and buttocks with his hand. When C.J. noticed the appellant doing this to her daughter, she immediately called her aunt, who, in turn, called the police. The appellant denied doing anything inappropriate, but then left the house.

As the investigating officers were on their way to C.J.'s home, they noticed the appellant driving in the vicinity of the home. The appellant's vehicle was pulled over by the officers and he was arrested for the separate offense of driving on a suspended license.[5] According to the April 1, 2008, Kanawha County Sheriff's Department Report of Investigation, "[a]fter conducting the traffic stop and gathering information from [the appellant], he stated that he pulled down the pants of the victim. Deputy M.D. Knapp arrived on scene of the traffic stop and detained [the appellant] while Deputy O'Neal continued to the scene of the sexual assault."

When Deputy O'Neal arrived at C.J.'s home, C.J. told him that after waking up just after midnight she got out of bed to check on her youngest child, C.P. As she left her bedroom and passed J.J.'s bedroom, she saw the appellant, dressed only in his boxer shorts, kneeling beside J.J.'s bed. She noticed that his penis was erect. She further said that J.J.'s pants were unbuttoned and partially pulled down and she was lying on her left side with her knees at the edge of her bed. Upon asking the appellant what he was doing, C.J. said he stated, "Baby I swear I didn't do nothing. I didn't do nothing baby I swear!" C.J. told the deputy that she suspected that something may have occurred between the appellant and J.J. prior to that evening. She said that on one occasion while J.J. was taking a bath, she noticed that she began rubbing her vagina with a rubber duck. On another occasion, C.J. said she had noticed redness around J.J.'s vagina. When Deputy O'Neal spoke to J.J. and asked her if the appellant touched her, J.J. answered "yes," but the deputy indicated that he was not sure what she meant by that answer.

**2.** West Virginia Code § 61–8D–5, in part, provides:

(a) In addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows: If any parent, guardian or custodian of or other person in a position of trust in relation to a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then such parent, guardian, custodian or person in a position of trust shall be guilty of a felony and, upon conviction thereof, shall be imprisoned in the penitentiary not less than ten nor more than twenty years, or fined not less than five hundred nor more than five thousand dollars and imprisoned in the penitentiary not less than ten years nor more than twenty years.

**3.** Our customary practice in cases involving minors is to refer to them by their initials rather than by their full names. In this case, J.J.'s mother will also be referred to by her initials. *See, e.g., In re Cesar L.*, 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).

**4.** At the time of the incident, C.J. was six months pregnant with the appellant's second child.

**5.** The appellant's driver's license was suspended for unpaid traffic tickets.

Upon arrival at the Kanawha County Sheriff's Department, the appellant was interviewed by Detective S.D. Snuffer. During the February 7, 2008, interview, the appellant was advised of his *Miranda*[6] rights, he stated that he understood those rights, and he signed a form waiving those rights. At the beginning of the interview, the appellant initially denied touching J.J. although he admitted pulling her pants and panties down. He also stated numerous times that he did not know why he was in J.J.'s bedroom at the time of the incident.

Q: What were you doing in the room?

A: I don't know sir. I just woke up and went in there. I did have, I swear I did have her pants down a little bit but I didn't do nothing. I don't know what I was doing sir. That's what I told [the other deputies]. I didn't touch her. I told her, [C.J.] the same thing [ ... ] in the Army you know they had me on medicine ... supposed to be on medicine but I don't know if that's what it is or I just don't know what I was doing sir but I didn't touch her. I swear. I'll admit I was in there and shit but I didn't, I did not touch her. It's like my daughter.

Q: Was she awake when you pulled her pants down?

A: Yes sir.

Q: Was she saying anything when you pulled her pants down?

A: No sir. But I didn't touch her.

He also denied being a pedophile, but claimed to suffer from a sickness. The appellant then admitted to having sexual dreams about J.J.

Q: How did you touch her in your dream?

A: It was like I just rubbed on her.

Q: Where did you rub her at?

A: I don't know just holding her and rubbing and stuff. Just like, almost like my old lady you know.

Q: Are you talking sexually or are you talking ...

A: No sir.

Q: Or are you talking just rubbing her arm?

A: No. Like her butt or whatever and then her arms and stuff. No sex. No sexual, no sex ... nothing like that.

Q: Are you sure?

A: I mean it was just, yeah but that there was sick.

As the interview progressed, the appellant admitted to actual physical contact with J.J. that was separate from his dreams. On numerous occasions during the interview, he stated, "I don't know what's wrong with me." He then admitted to rubbing J.J. around her vaginal area and buttocks with his fingers, but denied penetration. When asked how many times in the past he had touched J.J., the appellant said, "I'm not sure sir." Upon being asked if he had touched her inappropriately as many as thirty times, the appellant said, "No. Maybe once." When further asked, "this time and one other time are the only two times that you've ever done anything to [J.J.]?" the appellant said, "Yes sir." With regard to the other touching, the appellant stated that he did not penetrate her vagina. The appellant also denied touching his and C.J.'s other child, C.P. When asked why he had not touched C.P. and had only touched J.J., he stated:

I don't know sir. I've only done that right there [to J.J.] one or two times and ... no sir I don't find kids attractive. I mean myself I don't find ... I think it's sick but I don't know why I did that. I don't know sir. I really don't know.

---

**6.** In *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966), the United States Supreme Court set forth the requirements for interrogating a suspect as follows:

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Finally, when asked what he would have done to J.J. if C.J. had not entered the room that night, the appellant said, "I don't know sir."

On February 11, 2008, C.J. and J.J., accompanied by Deputy Snuffer, spoke with Maureen Runyon at Charleston Area Medical Center's Women and Children's Hospital (hereinafter, "CAMC") in Charleston, West Virginia. Ms. Runyon, a forensic sexual assault interviewer, questioned J.J. alone, while Deputy Snuffer observed the interview on the other side of a one-way mirror. Deputy Snuffer's Report of Investigation stated, "It was very hard to comprehend [J.J.] when she spoke. [J.J.] did not disclose anything during the interview." Also on February 11, 2008, Probation Officer Donald King went to the South Central Regional Jail to collect a urine sample from the appellant due to the appellant's probation for a prior conviction of breaking and entering. Officer King informed the appellant that he was there to collect a urine sample for the purpose of drug screening and not to discuss his current offense. Nonetheless, the appellant made an unsolicited statement that: "I'm not sure why I touched her like I did, I would never hurt her, I love her so much. It was like I was outside my body watching someone else touch her. I haven't been the same since I stopped tak[ing] my medications after I got out of the army."

On January 20, 2009, the State offered the appellant a plea agreement allowing him to plead guilty to one count of first degree sexual abuse and one count of sexual abuse by a parent, guardian or custodian. In exchange for guilty pleas to those two offenses, the State agreed to drop counts three and four, which included an additional charge of first degree sexual abuse, and another for sexual abuse by a parent, guardian or custodian. Following a March 9, 2009, hearing, wherein the appellant accepted the State's plea agreement, the circuit court found that the appellant had voluntarily, knowingly, and intelligently waived his constitutional rights,

that he was represented by competent defense counsel, and that he understood the potential consequences of his plea. The appellant did not object to anything prior to entering his plea of guilty nor did he reserve the right to file an appeal of the judgment against him for review of any potential errors from his pretrial motions. As such, this was not a conditional guilty plea as contemplated under Rule 11(a)(2) of the West Virginia Rules of Criminal Procedure.[7]

Prior to sentencing the appellant, the circuit court ordered a forensic psychological report and scheduled a sentencing hearing for May 19, 2009. On May 12, 2009, Dr. Steven Dryer, a forensic psychologist, performed the evaluation. With regard to the night he abused J.J. in her bedroom, the appellant told Dr. Dryer that: "I hadn't had much sleep for four or five days because I had been taking meth pretty heavily but I can't use that for an excuse because I've used meth heavily for a long time and a lot of other drugs, too." He further explained, "I knew what I was doing was wrong but it was like watching myself from a distance and it didn't seem like there was anything that I could do to change my behavior." The appellant said that J.J. had been

sleeping with me and my old lady and I woke up and took her into her room and when I was there I don't know what came over me. I pulled down her underpants and started touching around on her, touching her vagina and I probably actually touched on it a couple of times, maybe. Thank God my old lady walked in on me before anything more serious happened. I ran up to her saying I hadn't done nothing but, as you can imagine, she was pretty upset.

Dr. Dryer opined that the appellant "minimizes the degree to which deviant sexual thoughts and behaviors are being manifested." He said that the appellant also acknowledged gradually developing sexual feelings toward J.J. over an approximate six

7. Rule 11(a)(2) of the West Virginia Rules of Criminal Procedure provides:

Conditional Pleas. With the approval of the court and the consent of the state, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

month period of time, and that the appellant stated, "I had had feelings before but never acted on them, I don't know what's wrong with me that I even think about such a thing but, obviously, I need help."

Following a continuance, the appellant's sentencing hearing occurred on June 24, 2009.[8] At the hearing, the prosecuting attorney noted that the appellant was already on probation for breaking and entering when he committed the offenses against J.J. and recommended that the circuit court run his sentences for those crimes consecutively. By order entered that same day, the circuit court sentenced the appellant to five-to-twenty-five years on count one, and ten-to-twenty years on count two. The sentences were ordered to be served consecutively. On October 22, 2009, the appellant filed a motion for a reduction of his sentence pursuant to Rule 35(b) of the West Virginia Rules of Criminal Procedure.[9] On November 23, 2009, the circuit court denied the appellant's motion. This appeal followed.

## II.

### STANDARD OF REVIEW

■ As noted above, the appellant assigns as error the circuit court's failure to reconsider his sentence of one count of first degree sexual abuse and one count of sexual abuse by a parent, guardian or custodian. The following standard of review was enunciated in Syllabus Point 1 of *State v. Head*, 198 W.Va. 298, 480 S.E.2d 507 (1996), and will be utilized by this Court:

> In reviewing the findings of fact and conclusions of law of a circuit court con-

cerning an order on a motion made under Rule 35 of the West Virginia Rules of Criminal Procedure, we apply a three-pronged standard of review. We review the decision on the Rule 35 motion under an abuse of discretion standard; the underlying facts are reviewed under a clearly erroneous standard; and questions of law and interpretations of statutes and rules are subject to a *de novo* review.

With these standards in mind, the parties' arguments will be considered.

## III.

### DISCUSSION

The appellant presents two assignments of error. First, the appellant contends that the circuit court erred in not reconsidering his sentence because there were material misstatements of fact in the Sheriff's Department Report of Investigation (hereinafter, "sheriff's report"), the Probation Office's Presentence Report (hereinafter, the "presentence report"), and the Forensic Psychological Evaluation (hereinafter, "psychological evaluation") of the appellant. Next, the appellant argues that his convictions for both first degree sexual abuse and sexual abuse by a parent, guardian or custodian are a violation of double jeopardy.

### A. Motion for Reconsideration Based Upon Alleged Errors in Reports

■ The appellant argues that the circuit court erred when it denied his motion for a reduction of his sentence filed October 22, 2009, based upon misstatements of fact in the sheriff's report,[10] the presentence report,[11]

---

8. Both the transcript of the sentencing hearing and the appellee's brief state that the sentencing hearing occurred on September 24, 2009; however, the sentencing order indicates that the hearing occurred on June 24, 2009.

9. Rule 35(b) of the West Virginia Rules of Criminal Procedure provides:

    Reduction of Sentence. A motion to reduce a sentence may be made, or the court may reduce a sentence without motion within 120 days after the sentence is imposed or probation is revoked, or within 120 days after the entry of a mandate by the supreme court of appeals upon affirmance of a judgment of a conviction or probation revocation or the entry of an order by the supreme court of appeals dismiss-

ing or rejecting a petition for appeal of a judgment of a conviction or probation revocation. The court shall determine the motion within a reasonable time. Changing a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under this subdivision.

10. The appellant states that the sheriff's report was misleading regarding the child's assertions. More specifically, the appellant contends that the sheriff's report failed to acknowledge J.J.'s actual denials of contact by the appellant made by J.J. during the forensic interview at CAMC. According to the appellant, the sheriff's report only stated that the child "did not disclose anything

and psychological evaluation [12] considered as a part of his sentencing for the underlying crimes. The appellant's counsel also claims that he was unaware of a DVD of the forensic interview of the victim and that the three reports listed above were in error for failing to discuss the interview of the victim in more detail within those reports. Finally, the appellant argues that W.Va. R.Crim.Pro. Rule 32 is dispositive of the underlying issues and that his sentence should be reconsidered because it was based upon material misstatements of fact.

Conversely, the State maintains that because the appellant knew, or should have known, prior to the sentencing hearing about the alleged misstatements in the numerous reports, and had in his possession all of the documents in question, as well as the taped interview with the victim, but did not object to anything at sentencing, he has waived this assignment of error.

In support of his argument, the appellant relies upon the holding in *State v. Craft*, 200 W.Va. 496, 490 S.E.2d 315 (1997), which was based upon W.Va. R.Crim.Pro. Rule 32. The appellant's reliance on *Craft*, however, is misplaced. In *Craft*, *counsel for the defense objected to inaccurate information in his presentence report during the sentencing hearing. Craft*, 200 W.Va. at 498, 490 S.E.2d at 317. The problem in that case was that the circuit court failed to address the alleged

inaccuracies in the report *during the sentencing hearing* as mandated by W.Va. R.Crim.Pro. Rule 32. W.Va. R.Crim.Pro. Rule 32(c)(1), provides:

> Sentencing Hearing. At the sentencing hearing, the court must afford counsel for the defendant and for the state an opportunity to comment on the probation officer's determinations and other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony or other evidence on the objections. For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not effect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Board of Parole.

Furthermore, W.Va. R.Crim.Pro. Rule 32(b)(6)(B) requires that: "Within a period prior to the sentencing hearing, to be prescribed by the court, the parties shall file with the court any objections to any material information contained in or omitted from the presentence report." Finally, W.Va. R.Crim. Pro. Rule 32(b)(6)(C) states: "Except for any unresolved objection under subdivision

during the interview." The appellant, however, failed to include in his brief the sentence from the sheriff's report immediately preceding that statement which provided: "It was very hard to comprehend [J.J.] when she spoke." As the report explains, Ms. Runyon interviewed J.J. alone, while Deputy Snuffer observed the interview on the other side of a one-way mirror. Deputy Snuffer simply reported the events as they occurred on that day. Moreover, the entire interview of J.J. was available to the appellant's counsel.

**11.** The appellant argues that the presentence report was misleading by stating: "When authorities spoke with the minor victim ... and asked if her father touched her, she answered, 'Yes.'" The appellant, however, failed to include the rest of that sentence as included in the report which provided *"though no specific information was obtained."* The appellant has taken this partial sentence out of context as the presentence report was describing the events as they occurred on that evening. The appellant does not argue that

J.J. did not make the statement. Instead, the appellant maintains that the statement above, which occurred at J.J.'s home, was improperly included in the presentence report because it conflicted with the comments made by J.J. days later during the forensic interview conducted at CAMC wherein J.J. answered "no" to a question as to whether she had been touched by the appellant.

**12.** With regard to the psychological evaluation, the appellant contends that it contained errors because Dr. Dryer was critical of the appellant's unwillingness to admit he was a repeat offender. The appellant states that Dr. Dryer's statements were based upon the presentence report, which, as previously discussed, he believed to be in error. The problem with the appellant's argument, however, is that Dr. Dryer did not have a copy of the appellant's presentence report when he evaluated him. Instead, Dr. Dryer's information came directly from the appellant's own mouth during the psychological interview.

(b)(6)(B), the court may, at the hearing, accept the presentence report as its findings of fact. For good cause shown, the court may allow a new objection to be raised at any time before imposing sentence." As such, the defendant's appeal in *Craft* was not based upon the legitimacy of whether or not there were misstatements; instead, it was based upon the circuit court's failure to address the alleged misstatements brought to its attention during the sentencing hearing.

In the case at hand, the appellant did not object to the reports *during the sentencing hearing* even though he stated on the record that he had read the reports prior to the hearing. In fact, the record is clear that the appellant did not file or make a single objection below to any of the issues he argues herein. More specifically, the appellant did not object to the presentence report, the sheriff's report, the psychological evaluation, the DVD, or to any other report, document, or evidentiary, statutory, or constitutional matter before the circuit court prior to or during his sentencing hearing. The first time the appellant argued that there was any error below regarding his sentencing was in his motion for reconsideration of his sentence filed in the circuit court. Even then, however, he did not request a hearing to correct the alleged misstatements. Instead, he moved for a reduction of his sentence because he deemed it unduly harsh "in a sexual abuse case where there was no penetration, and the only evidence of sexual contact is the defendant's own admission to a touching that was so minimal that the victim doesn't appear to know that it even occurred." [13] The appellant's counsel's silence is not disputed by either party.

During oral argument before this Court, the appellant explained his failure to make any objections before the circuit court by stating that the alleged errors were not discovered until after his sentencing hearing and due to a last minute substitution of counsel prior to the hearing. This argument, however, is at odds with the appellant's counsel's own words and actions during the appellant's sentencing hearing. In fact, during the sentencing hearing, the appellant's counsel, who is the same counsel of record for the present appeal, stated affirmatively that he had reviewed the documents in question in preparation for the hearing. For example, the appellant's counsel stated during argument to the circuit court at the sentencing hearing that "*after reading through the presentence report of this case and also looking at the psychological evaluation,* I don't think that my client poses such a danger that everything needs to be run consecutively." Counsel for the appellant did not object to the contents of either document before or during the sentencing hearing nor did he request a continuance of the sentencing hearing for more time to review the evidence of record. Instead, the appellant's counsel's own words indicate that he was familiar with the evidence below prior to the appellant's sentencing hearing.

■ This Court has consistently held that "silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial." *State v. Grimmer,* 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), *overruled on other grounds* by *State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980). The raise or waive rule is designed "to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error." *Wimer v. Hinkle,* 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989).[14]

---

**13.** The appellant's counsel's characterization of the appellant's acts as "minimal" is troubling. The appellant admitted to Dr. Dryer that he had had very little sleep for the four or five days leading up to his assault of J.J. because he "had been taking meth pretty heavily." He admitted to having dreams about J.J. for a six month period. He also admitted that he knew what he was doing was wrong, but stated that "it didn't seem like there was anything that [he] could do to change [his] behavior." He admitted to taking J.J. to a room by herself wherein he pulled her

pants and underpants down and starting rubbing around her vagina. If C.J. had not found the appellant rubbing her daughter's vagina as he was kneeling over her with an erect penis, it is likely that the situation would have been even worse. As the appellant explained, "Thank God my old lady walked in on me before anything more serious happened."

**14.** The "raise or waive" rule is not absolute where, in extraordinary circumstances, the failure to object constitutes plain error. "The 'plain

In *State v. LaRock,* 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996), this Court explained as follows:

> Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights.... When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

The *LaRock* Court further explained that: "One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result in the imposition of a procedural bar to an appeal of that issue." *Id.* (internal quotations and citations omitted). *See also Powderidge Unit Owners Ass'n v. Highland Props., Ltd.,* 196 W.Va. 692, 703, 474 S.E.2d 872, 883 (1996) ("The law ministers to the vigilant, not those

who slumber on their rights." (internal quotations and citations omitted)); *State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) ("The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." (citation omitted)); *Hanlon v. Logan County Bd. of Educ.,* 201 W.Va. 305, 316, 496 S.E.2d 447, 458 (1997) ("A party simply cannot acquiesce to, or be the source of, an error during proceedings before a tribunal and then complain of that error at a later date." (citations omitted)); *State v. Asbury,* 187 W.Va. 87, 91, 415 S.E.2d 891, 895 (1992) ("Generally the failure to object constitutes a waiver of the right to raise the matter on appeal.").

In summary, the record shows that the appellant never objected prior to his sentencing hearing to any of the reports of which he now asserts contained material misstatements of fact. Moreover, counsel for the appellant indicated that he had reviewed the documents prior to sentencing. Likewise, while the appellant's counsel claims that he was unaware of the DVD of the forensic interview of the victim, the record indicated that the DVD was provided to the appellant during discovery on October 7, 2008, approximately eight months prior to the appellant's sentencing. In addition to the DVD being provided directly to the appellant, it was also discussed throughout the sheriff's report as well as being clearly identified and listed among the exhibits in the report as "Video tape containing the audio and visual interview of [J.J.] by Maureen Runyon." In light of the aforementioned, the appellant waived this assignment of error.[15]

---

error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." *State v. Miller,* 194 W.Va. 3, 18, 459 S.E.2d 114, 129 (1995). "Under plain error, appellate courts will notice unpreserved errors in the most egregious circumstances. Even then, errors not seasonably brought to the attention of the trial court will justify appellate intervention only where substantial rights are affected." *State v. LaRock,* 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996). Where, however, "there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law

need not be determined." Syllabus Point 8, in part, *Miller.* The failure of counsel to object to the alleged misstatements in the reports does not necessitate a plain error analysis insofar as counsel not only failed to object to, but affirmatively explained that he had reviewed the documents in question in preparation for the sentencing hearing. Moreover, the appellant does not argue that this Court should consider a plain error analysis. Instead, the appellant simply states that no waiver occurred.

15. Despite his guilty pleas to two separate offenses against J.J., the appellant seems to be

## B. Double Jeopardy

■ The appellant's final argument is that his sentence for one count of first degree sexual abuse and one count of sexual abuse by a parent, guardian or custodian violates the principles of double jeopardy. He admits that this issue was squarely decided by this Court in *State v. Gill,* 187 W.Va. 136, 416 S.E.2d 253 (1992); however, he contends that *Gill* was improperly decided.

■ As a preliminary matter, the appellant is correct that this issue was squarely decided in *Gill.* Moreover, the appellant has provided no cogent argument to change that result.[16] With regard to double jeopardy, *Gill* provides that three separate constitutional protections are contained within the guarantee that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see* W.Va. Const. art. III, § 5 (providing that "[n]o person shall ... be twice put in jeopardy of life or liberty for the same of-fense"). Through the double jeopardy clauses of our state and federal constitutions, citizens are protected against: (1) a second prosecution for the same offense after an acquittal; (2) a second prosecution for the same offense after a conviction; and (3) multiple punishments for the same offense. *See Gill,* 187 W.Va. at 141, 416 S.E.2d at 258 (*citing North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)). Like this case, the issue presented in *Gill* was the third component of the double jeopardy clause, i.e., the protection against multiple punishments for the same offense.

■ As explained in *State ex rel. Games–Neely v. Silver,* 226 W.Va. 11, 15, 697 S.E.2d 47, 51 (2010),

Preventing a sentencing court from imposing punishment that differs from what the legislature has designated is the objective which underlies the prohibition of multiple punishments for the same offense. *Gill,* 187 W.Va. at 141, 416 S.E.2d at 258

---

attempting to re-litigate his guilt in hopes of receiving a lesser sentence. Moreover, he is attempting to do so by challenging the veracity of a three-year-old child's scattered comments during a brief forensic interview. This Court has explained that "[a]ssuming it otherwise meets the requirements of admissibility, the reliability of a child's testimony is properly a matter for assessment by the trier of fact who is charged with making determinations regarding the weight and credibility of such testimony." Syllabus Point 3, *State v. Smith,* 225 W.Va. 706, 696 S.E.2d 8 (2010). Given the appellant's guilty plea below, J.J.'s testimony was not at issue. This Court did, however, view J.J.'s interview in its entirety. It shows a typical three-year-old girl with a limited attention span responding to a litany of questions posed by a stranger during a brief interview. J.J. rolled around the couch, sat on the floor, lifted the couch cushions up and down, played with her coat and shirt that were sitting beside her, played with a folded piece of paper, jumped and kicked, grabbed and played with the paper that hung from the wall that was being used by the interviewer, and, in general, was nonresponsive as she continuously looked around the room. When asked: "What is this?" as the interviewer pointed to a picture of a boy and a girl and identified the girl's feet in the picture, J.J. stated, "I don't know." When asked, "What is this?" with regard to hair, a hand, a leg, a belly button, and other body parts, each time J.J. stated, "I don't know." When the interviewer asked J.J. to "show me the butt on the girl," J.J. pointed to a blank part of the paper. When asked, "Look at the picture of the girl, does she have a butt?", J.J. answered, "no."

When asked, "Nowhere on her body[?]", J.J. answered, "No." These questions were after the body part had already been identified on the diagram. During the interview, J.J. more often than not answered "No" or "I don't know" to most of the questions posed to her regardless of the question and often prior to the completion of the question. The appellant's reliance on J.J.'s answer of "no" to a question about whether he had ever touched her is of little significance in light of the entire interview.

**16.** To adopt the position of the appellant, this Court would be required to disregard the doctrine of stare decisis. *See Mayhew v. Mayhew,* 205 W.Va. 490, 499, 519 S.E.2d 188, 197 (1999) (" 'Stare decisis is the policy of the court to stand by precedent.' *Banker v. Banker,* 196 W.Va. 535, 546 n. 13, 474 S.E.2d 465, 476 n. 13 (1996)). There are simply no grounds in this case to warrant such disregard. *See Woodrum v. Johnson,* 210 W.Va. 762, 766 n. 8, 559 S.E.2d 908, 912 n. 8 (2001) ('Stare decisis is not a rule of law but a matter of judicial policy ... It is a policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation.... In the rare case when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted.' " (quoting *Dailey v. Bechtel Corp.,* 157 W.Va. 1023, 1029, 207 S.E.2d 169, 173 (1974) (additional citations omitted))).

(*citing Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)). Consequently, the determination of whether multiple punishments for the same underlying offense run afoul of the double jeopardy clause is controlled by legislative intent. *See Gill*, 187 W.Va. at 141–42, 416 S.E.2d at 258–59. Under the test first announced in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), violations of double jeopardy were initially based solely upon a determination of whether "there [we]re two offenses or only one" and that issue was arrived at by examining "whether each provision require[d] proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. 180. However, as the United States Supreme Court subsequently recognized, the test announced in *Blockburger* is not determinative in all instances because a legislative body has the prerogative to impose cumulative punishments for the same conduct. *Gill*, 187 W.Va. at 142, 416 S.E.2d at 259 (discussing how presumption underlying *Blockburger* test is that Congress ordinarily does not impose punishment under separate statutes for the same offense). The *Gill* Court further explained that: "In view of this clear sentencing prerogative, we evaluate multiple punishments for double jeopardy purposes by the following standard:

In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative

intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.

Syllabus Point 8, *Gill*. In this case, W.Va. Code § 61–8D–5(a) unambiguously sets forth the Legislature's intent and therefore there is no need to subject the statutory language to the *Blockburger* test. As quoted earlier, West Virginia Code § 61–8D–5, in part, provides: "(a) In addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows. . . ." As such, the *Gill* Court has made it perfectly clear that there are no double jeopardy issues with a conviction for both sexual abuse and sexual abuse by a guardian.[17]

▮▮▮▮ Notwithstanding the fact that this Court has already held that the appellant's separate convictions for sexual abuse and sexual abuse by a guardian do not violate double jeopardy principles, this Court finds that the appellant also waived this assignment of error. In that regard, this court has explained that a plea agreement is subject to the principles of contract law insofar as its application insures that a defendant receives that to which he or she is reasonably entitled. In *State ex rel. Gardner v. West Virginia*

---

**17.** It is undisputed that the sentence imposed upon the appellant by the circuit court was within the statutory limits. As this Court has firmly established, "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syllabus Point 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982). Moreover, Syllabus Point 1 of *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997), holds: "The Supreme Court of Appeals reviews sentencing orders, including orders of restitution made in connection with a defendant's sentencing, under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Furthermore, in *State v. Sugg*, 193 W.Va. 388, 406, 456 S.E.2d 469, 487

(1995), we held that "[a]s a general proposition, we will not disturb a sentence following a criminal conviction if it falls within the range of what is permitted under the statute."

Here, the appellant pled guilty to one count of first degree sexual abuse and one count of sexual abuse by a parent, guardian or custodian. A motion to reconsider the appellant's sentence was denied by the circuit court by order entered on November 23, 2009. As stated, the sentence was within statutory limits and was not based upon any impermissible factor. As such, the decision of the circuit court in the case at hand is "protected by the parameters of sound discretion." *State v. Shingleton*, 222 W.Va. 647, 652, 671 S.E.2d 478, 483 (2008).

*Div. of Corrections,* 210 W.Va. 783, 786, 559 S.E.2d 929, 932 (2002), this Court explained:

> We have recognized that "[a]s a matter of criminal jurisprudence, a plea agreement is subject to principles of contract law insofar as its application insures a defendant receives that to which he is reasonably entitled." *State ex rel. Brewer v. Starcher,* 195 W.Va. 185, 192, 465 S.E.2d 185, 192 (1995). Such agreements require "ordinary contract principles to be supplemented with a concern that the bargaining and execution process does not violate the defendant's right to fundamental fairness[.]" *State v. Myers,* 204 W.Va. 449, 458, 513 S.E.2d 676, 685 (1998).

Likewise, "When a defendant enters into a valid plea agreement with the State that is accepted by the trial court, an enforceable 'right' inures to both the State and the defendant not to have the terms of the plea agreement breached by either party." Syllabus Point 4, *State v. Myers,* 204 W.Va. 449, 513 S.E.2d 676 (1998).

In the case at hand, the appellant was represented by counsel. He entered a plea of guilty to the offenses discussed herein and he was sentenced within permissible statutory limits. He stated that he understood the charges against him and his counsel stated that he had thoroughly explained the charges to the appellant. He voluntarily entered into the plea agreement, he does not deny his guilt, and he does not challenge the validity of his guilty plea. Moreover, during the sentencing hearing, the appellant's counsel stated: "Your Honor, my client has obviously pled guilty to two serious charges. And as we've seen here today his actions have hurt [the] victim, as well as the victim's family in this matter." At no point in any hearing did the appellant's counsel make a single reference to the possibility of double jeopardy for the appellant's guilty plea to both charges or to the fact that he would receive separate sentences for both crimes. In fact, the only argument during the sentencing hearing by the appellant's counsel was that the appellant be sentenced concurrently for both crimes. As previously stated in *LaRock,*

> There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*Id.* at 316, 470 S.E.2d at 635. This Court is not persuaded by the appellant's counsel's argument on this matter as the appellant waived this assignment of error by entering a guilty plea to both crimes.[18]

In *State v. Carroll,* 150 W.Va. 765, 769, 149 S.E.2d 309, 312 (1966), this Court stated that "the defense of double jeopardy may be waived and the failure to properly raise it in the trial court operates as a waiver." *See also Adkins v. Leverette,* 164 W.Va. 377, 381, 264 S.E.2d 154, 156 (1980) ("we subscribe to the proposition, that jeopardy, having attached, may be waived by the defendant and in a subsequent timely trial on the same offense said defendant cannot successfully claim that he is being subjected to double jeopardy" (citation omitted)). Moreover, in *State v. Greene,* 196 W.Va. 500, 507 n. 1, 473

---

18. In *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), the Supreme Court of the United States explained that "[i]t is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." In *United States v. Broce,* 488 U.S. 563, 574–75, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989), the Supreme Court recognized two exceptions to the general rule that a guilty plea results in waiver of a double jeopardy claim: (1) if there exists a realistic likelihood of prosecutorial vindictiveness in contravention of defendant's right to due process of law (citing *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974)); or (2) if the charge, when judged on its face, is one which the State may not constitutionally prosecute (citing *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975)). The exceptions noted in *Broce* have no application under the present circumstances. There is no claim of prosecutorial vindictiveness, and the charges of sexual abuse and sexual abuse by a parent, guardian or custodian are separate and distinct offenses. *See Gill, supra.*

S.E.2d 921, 928 n. 1 (1996), this Court explained:

A knowing and voluntary guilty plea waives all antecedent, nonjurisdictional defects. A double jeopardy claim is not a "true" jurisdictional issue (one that renders the court powerless to consider the case) and for that reason can be subject to waiver under appropriate circumstances. Absent exceptional circumstances, such as where the parties execute an agreement reached prior to the plea, this Court will not recognize an attempt to reserve the right of appeal nunc pro tunc. In short, the failure to follow the procedures set forth in Rule 11(a)(2) of the West Virginia Rules of Criminal Procedure will result in a valid guilty plea waiving all nonjurisdictional defects in the proceedings below.

In consideration of all of the above, the circuit court did not commit reversible error in refusing the appellant's motion for reconsideration.

## IV.

### CONCLUSION

Accordingly, for the reasons stated above, the final order of the Circuit Court of Kanawha County entered on November 23, 2009, is affirmed.

Affirmed.